UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LEA RODRIGUES,     *
           *
  Plaintiff,      *
           *
    v.       *
           *  Civil Action No. 1:24-cv-11737-IT
FRANK BISIGNANO,[1]    *
Commissioner of Social Security, *
           *
  Defendant.

MEMORANDUM & ORDER

September 25, 2025

TALWANI, D.J.

   Pending before the court is Plaintiff Lea Rodrigues's Complaint [Doc. No. 1] seeking

reversal of the Commissioner of Social Security's ("Commissioner") determination that

Rodrigues is not eligible for disability benefits pursuant to 42 U.S.C. § 405(g), or in the

alternative, remand to the Commissioner, and Defendant's Motion to Affirm the Commissioner's

Decision [Doc. No. 12]. For the following reasons, the Commissioner's Motion to Affirm [Doc.

No. 12] is GRANTED.

## I.  Procedural Background

   Rodrigues applied for supplemental security income on October 8, 2020, alleging

disability beginning August 1, 2018, that included anxiety, depression, deep vein thrombosis

("DVT"), and pulmonary embolism. See Administrative Record ("A.R.") 168, 321, 329 [Doc.

No. 9]. The Social Security Administration ("SSA") denied Rodrigues's claim on December 22,

---

[1] Defendant Bisignano has been substituted for the former Commissioner of Social Security. See
Fed. R. Civ. P. 25(d).

2021. Id. at 164. Rodrigues requested reconsideration on April 4, 2022. Id. at 168. The SSA affirmed its denial of her claim on November 1, 2022. Id. at 173.

On November 16, 2022, Rodrigues appealed the denial and requested a hearing with an Administrative Law Judge ("ALJ"). Id. at 184–85. The ALJ held a hearing on June 28, 2023, and issued an unfavorable decision on October 4, 2023. Id. at 14–27. Rodrigues filed a request for review of the ALJ's decision with SSA's Appeals Council, which the Appeals Council denied on May 1, 2024, making the ALJ's decision the final determination of the Commissioner. Id. at 1–6; see also 20 C.F.R. § 404.981.

Rodrigues filed her Complaint [Doc. No. 1] in this court on July 5, 2024, seeking review of the denial of her claim.

## II.    Factual Background

### A.    *Age, Education, and Work History*

Rodrigues was born in 1987 and was 33 years old when she filed her October 2020 application for benefits. See A.R. 41 [Doc. No. 9]. Rodrigues has completed her GED and has no further education. Id. Rodrigues has worked part time as a server and bartender at various establishments prior to and since submitting her application. See id. at 306–310, 1136.

### B.    *Medical History*

#### 1.    Initial Medical Record Presented to the State Examiners

Rodrigues was struck by a motor vehicle in August 2018 and was hospitalized for two weeks after losing consciousness and sustaining a subdermal hematoma. Id. at 786. Following the motor vehicle accident, Rodrigues began to experience vertigo. Id. at 50–51. From August 2018 through April 2021, Rodrigues's primary care provider, Abena Addo, M.D., evaluated her at regular visits. Id. at 411–66, 702–45. At several visits during that period, Rodrigues reported symptoms of headaches, dizziness, memory loss, and loss of smell and taste. Id. at 431, 436, 444,

447, 454–55. Rodrigues underwent a head CT scan in February 2021 indicated by posttraumatic headache and a brain MRI in March 2021. Id. at 743–44. Dr. Addo described the results as unremarkable. Id.

On September 27, 2018, Mohammad Munir, M.D., examined Rodrigues and diagnosed her with an anxiety disorder of unspecified severity and a major depressive disorder of moderate severity. Id. at 545. Dr. Munir prescribed psychiatric medications. Id. at 545–46. At regular follow-up visits from October 2018 through July 2020, Dr. Munir reported a reduction in Rodrigues's symptoms, improvements in her mood and condition, and stable behavior. Id. at 510–44.

Between October 4, 2019, and September 18, 2020, Rodrigues regularly visited Alves Chiropractic Center for examination and treatment of back and neck pain. See id. at 946–1025. At her initial visit, Michael Boucher, D.C., assessed Rodrigues as suffering from conditions that included memory loss, vertigo, post-concussion syndrome, and post-traumatic headache. Id. at 1025. On February 24, 2020, Dr. Boucher described her vertigo as resolved and her post-concussion syndrome as resolving. Id. 956–57. At her final visit on September 18, 2020, Dr. Boucher indicated that Rodrigues continued to suffer from back pain but did not include memory loss, vertigo, post-concussion syndrome, and post-traumatic headache in his assessment. Id. at 946.

In July 2020, Rodrigues was admitted to St. Luke's Hospital in New Bedford, MA and diagnosed with acute deep vein thrombosis ("DVT"), an acute pulmonary embolism, and left leg pain. Id. at 416–17, 420. Rodrigues visited Dr. Munir again in August 2020 following her hospitalization, and he noted an increase in anxiety symptoms and episodic but manageable depressive symptoms. Id. at 508. Dr. Munir reiterated an increase in anxiety and episodic

depressive symptoms at another appointment in October 2020. Id. at 506. At both visits, Dr.

Munir noted that Rodrigues had no serious or gross mental status abnormalities. Id. at 506, 508.

On December 31, 2020, Rodrigues reported suffering a concussion, because of a fall. Id. at

1031, 1591. On March 2, 2021, Rodrigues had a telemedicine visit with Hannah Raymond, N.P.

regarding headaches and symptoms of a severe concussion following that fall. Id. at 719–20.

Rodrigues reported that she was having extreme headaches that "feel like brain freezes" with

dizziness, light sensitivity, and nausea but no vomiting. Id. at 720. Rodrigues reported that her

symptoms had not worsened since receiving a CT scan on February 2, 2021, which had showed

no acute abnormality. Id. N.P Raymond reported that Rodrigues showed no signs of acute

neurologic impairment. Id. at 733.

At a visit on March 4, 2021, with Richard Pin, M.D., Rodrigues denied any significant

pain or swelling in her left leg and sought to discontinue her medication for DVT. Id. at 693–94.

An ultrasound showed no evidence of DVT in Rodrigues's leg. Id.

On March 23, 2021, Rodrigues had another appointment with N.P. Raymond, and

Rodrigues reported that she had suffered another head injury a week earlier, which caused an

increase in her headaches and dizziness. Id. at 734. N.P. Raymond also noted Rodrigues had

blurred vision. Id. at 734. An MRI following this injury did not show acute findings. Id. N.P.

Raymond referred Rodrigues for a head CT scan. Id. at 738. The CT scan did not show acute

intracranial process. Id. at 743.

Rodrigues has also dealt with alcohol substance abuse issues in her past, but she largely

stopped drinking in 2018. See id. at 53–54.

     2.   State Agency Initial Review

In June 2021, Lucinda Wheelock, M.D., conducted an initial state agency review of

Rodrigues's impairments and found that Rodrigues had no medically determinable impairment.

Id. at 132–40. A second initial state agency review by Dr. Steven Fischer and Dr. Robin McFee in December 2021 identified Rodrigues's depressive, bipolar, and related disorders as well as her anxiety and obsessive-compulsive disorders as "severe," but ultimately concluded there was insufficient evidence to address Rodrigues's allegations of disability. Id. at 144–45.

### 3.  Further Record Presented to State Examiners

Between December 1, 2021, and October 6, 2022, Michael McLaughlin, P.A. of Boston Neurobehavioral Associates in New Bedford, MA regularly evaluated Rodrigues. Id. at 793–846. During this period, P.A. McLaughlin adjusted dosages of Rodrigues's psychiatric medications and reaffirmed diagnoses of an anxiety disorder of unspecified severity and a recurring major depressive disorder of moderate severity, but he regularly noted her stable moods, tolerance for medications, and decreases in her anxiety and depression symptoms. Id. On January 12, 2022, Rodrigues presented to Boston Neurobehavioral Associates as an established patient after falling down the stairs and hitting her head and was given medication for migraines. Id. at 839. She also reported that medications from previous visits had "been working well." Id.

On July 27, 2022, Rodrigues underwent a neuropsychological evaluation with Saumya Sharma, Ph.D., at the request of the Massachusetts Department of Children and Families to determine Rodrigues's fitness for custody of her daughter. Id. at 786–89. At the evaluation, Rodrigues reported mild short-term memory issues, vertigo, migraines, and loss of taste. Id. at 786. Dr. Sharma diagnosed Rodrigues with unspecified traumatic brain injury, generalized anxiety disorder, and unspecified mood disorder. Id. at 788. Dr. Sharma observed that Rodrigues's anxiety and depression symptoms were well-managed with medication and therapy. Id.

Following an altercation with her boyfriend in 2022, Rodrigues regularly attended a court-ordered weekly alcohol group program. Id. at 54–56, 793.

5

4.  State Agency Further Review

State agency medical consultants Dr. Stephen Kleinman and Dr. Stephanie Green considered Rodrigues's file in November 2022 and found that despite Rodrigues having mild mental limitations, she had no severe impairments and was not disabled. Id. at 149–55. Dr. Green noted that Rodrigues suffered from post concussive headache syndrome, which was a non-severe impairment. Id. at 152. The evaluation also determined Rodrigues's thrombosis and hemostasis, depressive, bipolar, and related disorders, respiratory system disorders, and anxiety and obsessive-compulsive disorders were non-severe impairments. Id.

5.  Additional Medical Records

After the last state agency reconsideration and prior to the June 2023 hearing before the ALJ, Rodrigues presented further medical records of visits to various providers and a series of examinations including counseling, mental status exams, emergency visits, physical exams, and chiropractic treatment. Id. at 853–1774.

On February 3, 2021, Rodrigues visited the emergency department at St. Luke's Hospital and presented with gradual onset intermittent generalized headaches "without clear alleviating or exacerbating factors" that had started after a fall on New Year's Eve. Id. at 1591. Rodrigues denied "vision change, eye pain or photophobia, focal weakness, paresthesias or numbness, nausea/vomiting or diaphoresis." Id. Hospital providers performed a head CT scan, which showed no acute intracranial pathology. Id. at 1598. Her differential diagnosis included "migraine variant" with "possible tension headache." Id. at 1595.

At a visit with Lotte Sherman, P.A., on December 16, 2021, Rodrigues reported increased dizziness since falling on December 7, for which she was seen by the St. Luke's Hospital emergency department and underwent a head CT scan. Id. at 1757. P.A. Sherman noted that the CT scan showed no acute intracranial abnormality. Id. Rodrigues also reported migraine-like

headaches twice within the previous one or two months, and that she was managing her symptoms by taking Meclizine. Id.

On July 19, 2022, Rodrigues presented to St. Luke's Hospital primarily for shortness of breath and leg pain, but also reported a migraine that she "ha[d] been having for a full[] week." Id. at 1346.

On October 12, 2022, at a visit to P.A. Sherman for COVID-19 symptoms, Rodrigues reported that the migraine medication she had been prescribed was "too strong" and that over-the-counter Excedrin "works for her." Id. at 879, 884.

Treatment records from P.A. McLaughlin and James Biedek, LICSW at Boston Neurobehavioral Associates from February 28, 2023, through May 12, 2023, reiterate Rodrigues's previous diagnoses and indicate that she reported a stable mood and that she was managing anxiety with medication. Id. at 1102–19, 1136–83.

At a telehealth visit with LICSW Biedek on May 12, 2023, Rodrigues reported that she was having migraines again. Id. at 1178. On May 18, 2023, Rodrigues visited the emergency department at Charlton Memorial hospital reporting a migraine. Id. at 1688–1706. She reported that she had felt lightheaded at work and "had a near syncopal episode," but denied falling or suffering a head strike. Id. at 1688. Rodrigues was triaged as having migraines that were "chronic w/ severe exacerbation," and her condition was designated as "moderate." Id. Rodrigues reported that she was not taking amitriptyline because it "makes her groggy." Id. at 1692. She left the emergency room before her examination was complete and she did not receive a diagnosis. Id. at 1691–92.

### III.    Standard of Review

Under the Social Security Act, the Social Security Administration has established

a five-step sequential evaluation process for determining whether an individual is disabled. See 20 C.F.R §§ 404.1520(a), 416.920(a).

> The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals an impairment listed under 20 C.F.R. Part 404, Subpart P, Appendix 1, and meets the duration requirement; (4) whether the claimant has the residual functional capacity to perform his past relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience.

Sastre v. Astrue, 870 F. Supp. 2d 267, 274 (D. Mass. 2012) (citing 20 C.F.R. § 416.920).

Under sentence four of 42 U.S.C. § 405(g), a district court has the power to affirm, modify or reverse a decision of the Commissioner, with or without remanding the case for a rehearing. The district court must make its decision based on the pleadings and transcript of the record before the Commissioner; when the Commissioner's findings are supported by "substantial evidence" and conform to relevant law, they are conclusive. See Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018); see also Rodriguez Pagan v. Sec'y of Health & Hum. Servs., 819 F.2d 1, 3 (1st Cir. 1987) (court must affirm Commissioner's decision "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence").

Substantial evidence review is deferential; while "more than a scintilla of evidence is required to meet the benchmark, a preponderance of evidence is not." Purdy, 887 F.3d at 13. (internal citation and quotation omitted). Substantial means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 587 U.S. 97, 103 (2019) (internal citation and quotation omitted). However, the decision of the ALJ is "not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). The court can reverse the Commissioner's final decision when the underlying facts and law are such that the agency has no discretion to act in any manner other than to award or deny benefits. Seavey v. Barnhart,

276 F.3d 1, 11 (1st Cir. 2001). However, if a court reverses the Commissioner's decision but there is no clear entitlement to benefits based on the record before the court, the court must remand for further proceedings. Id. at 12 ("When an agency has not considered all relevant factors in taking action, or has provided insufficient explanation for its action, the reviewing court should ordinarily remand the case to the agency.") (citation omitted).

## IV.    Discussion

The ALJ proceeded through the five-step analysis to determine whether Rodrigues was disabled from the onset date of August 1, 2018, through the date of the decision. A.R. 18–27 [Doc. No. 9].

At step 1, the ALJ found that Rodrigues had not engaged in substantial gainful activity since the initial application was filed. Id. at 19.

At step 2, the ALJ found that Rodrigues had two severe impairments: a major depressive disorder and a generalized anxiety disorder. Id. The ALJ also analyzed Rodrigues's vertigo and alcohol abuse conditions. Id. at 20–21. Regarding vertigo, the ALJ found that the record contained little objective evidence related to Rodrigues's vertigo, that her allegations regarding debilitating symptoms of vertigo were not supported by the medical evidence in the record, and that Rodrigues's alleged vertigo is not severe. Id. at 21. Regarding Rodrigues's substance abuse, the ALJ noted Rodrigues's testimony that she had not used alcohol regularly since 2018 and had been keeping up with her court-court ordered alcohol program, which she was attending weekly. Id. The ALJ found that her substance abuse impairment caused no more than minimal limitation on her ability to perform basic work and was not severe. Id.

At step 3, the ALJ found that Rodrigues did not have an impairment or combination of impairments that met the conditions for one of the impairments listed in the Social Security regulations. Id. at 21.

At step 4, the ALJ found that Rodrigues had the residual functional capacity ("RFC") to:

> perform a full range of work at all exertional levels but with the following
> nonexertional limitations: the claimant can never climb ladders, ropes or scaffolds,
> she must avoid exposure to unprotected heights and moving and dangerous
> machinery, she would be able to understand and carry out instructions for simple,
> routine tasks and maintain concentration, persistence and pace in the performance
> of these tasks for two hour increments over an 8 hour workday and during a 40 hour
> workweek, she would be able to relate to co-workers, supervisors and the public on
> a superficial interactional basis, being defined as the exchange of work-related
> information or the handing off of products or materials, she would be able to deal
> with only minor changes in the workplace and she can tolerate no more than
> occasional interaction with the general public.

Id. at 22–23. However, the ALJ found that Rodrigues did not have past relevant work. Id. at 26.

At step 5, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Rodrigues can perform based on her age, education, work experience, and RFC. Id. at 26–27. The ALJ relied on the testimony of a vocational expert ("VE") who testified that Rodrigues would be able to perform the requirements of representative occupations such as a laundry worker, a cleaner, and a merchandise maker. Id. at 27. Based on this testimony, the ALJ concluded that Rodrigues is capable of making a successful adjustment to other work and accordingly found she was not disabled under the Social Security Act. Id.

Rodrigues argues that the ALJ erred by (1) basing his RFC finding on a lay interpretation of medical records received after the state agency's last file review; (2) failing to address Rodrigues's post concussive headache syndrome as identified by Dr. Green; and (3) basing his decision to deny benefits on VE testimony that relied upon an improper hypothetical that the ALJ presented. Mem. ISO Mot. to Reverse 10–19 [Doc. No. 10].

A.    *Whether the ALJ Erred by Basing His RFC Finding at Step 4 on a Lay Interpretation of Medical Records*

Rodrigues contends that the ALJ's RFC finding is based on his own lay interpretation of over 900 pages of medical records received after the state agency file review. Id. at 10.

10

Rodrigues argues that because the ALJ rejected the state agency opinions, he effectively relied on a "bare medical record" and "crafted his own RFC out of whole cloth supported only by [his own] lay analysis." See id. at 11. The Commissioner responds that the ALJ properly evaluated evidence post-dating the state agency assessments, and that an ALJ need not obtain a new medical opinion whenever evidence is added to the record after state agency review. Mem. ISO Mot. to Affirm at 13–14 [Doc. No. 13]. The Commissioner also argues that the ALJ did not err in declining to defer to the state agency assessment because he gave Rodrigues "the benefit of the doubt" by weighing other records more heavily to form a more limiting RFC. Mem. ISO Mot. to Affirm at 12–13 [Doc. No. 13].

      1.   Reliance on Post-Reconsideration Records

Bare medical findings and diagnoses "are unintelligible to a lay person in terms of residual functional capacity." Rosado v. Sec'y of Health & Hum. Servs., 807 F.2d 292, 293 (1st Cir. 1986). Therefore, "an ALJ, as a lay person, is not qualified to interpret raw data in a medical record." Manso-Pizarro v. Sec'y of Health & Hum. Servs., 76 F.3d 15, 17 (1st Cir. 1996) (internal citation and quotation omitted). "[A]n expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." Id. (quoting Santiago v. Sec'y of Health & Hum. Servs., 944 F.2d 1, 7 (1st Cir. 1991)). And "[w]here the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." Manso-Pizarro, 76 F.3d at 17.

Here, the evidence submitted after reconsideration "shows relatively little physical impairment" and describes findings in plain terms such that the ALJ did not need a new expert RFC evaluation. Id. In determining Rodrigues's RFC, the ALJ cited exhibits in the record regarding Rodrigues's psychiatric health dating as far back as December 1, 2021, and as recently

11

as May 12, 2023. A.R. 24–25 [Doc. No. 9]. Those records include observations from treating professionals that Rodrigues demonstrated "no signs of anxiety," id. 803, reported prescription medication had been working to stabilize her mood, id. 798, was diagnosed with anxiety and major depressive disorders but that various components of her mental status were "normal," "good," and "intact," id. at 1136–37, and that Rodrigues was "[f]eeling good" about her work as a waitress and that she reported "she can handle it easily," id. at 1136. The ALJ's discussion of those records reflect those observations. See id. at 24–25.

Although the ALJ considered a large quantity of documents that were not included in an expert's RFC evaluation, it is the complexity of the medical findings that determines whether they are unintelligible to a lay person. See Manso-Pizzaro, 76 F.3d at 17 (explaining that "the question whether substantial evidence supports" the ALJ's RFC finding "depends on a qualitative assessment of the medical evidence that was before the ALJ"). Where the ALJ's findings reflect the observations in Rodrigues's post-reconsideration medical records, and where those records describe Rodrigues's condition in terms that a lay person can interpret, see A.R. 24–26 [Doc. No. 9], the ALJ did not improperly rely on "bare medical records." Cf. Berrios v. Sec'y of Health & Hum. Servs., 796 F.2d 574, 576 (1st Cir. 1986) (holding Appeals Council improperly interpreted and applied "raw, technical medical data" consisting of a rheumatologist's report containing "medical jargon" and two myelogram tests).

### 2. Dismissal of State Agency Evaluator Opinions

ALJs assess "residual functional capacity based on all of the relevant medical and other evidence." 20 C.F.R. § 416.945(a)(3). An ALJ may piece together relevant medical facts from the findings and opinions of multiple physicians without the assistance of a single "super-evaluator." Evangelista v. Sec'y of Health & Hum. Servs., 826 F.2d 136, 144 (1st Cir. 1987). An ALJ's RFC determination that is more restrictive than limitations identified by state agency

physicians does not constitute reversible error. See also Yearling v. Colvin, 292 F. Supp. 3d 515, 520 (D. Mass. 2017) ("If the RFC includes greater limitations than those in a physician's assessment, such limitations cannot be used to discount the ALJ's determination").

The ALJ considered medical records from a variety of sources in determining Rodrigues's RFC. The ALJ did not flatly reject the opinions of the state evaluators but instead reviewed them and considered them "not persuasive" because they were inconsistent with opinions from Rodrigues's treating physicians. A.R. 25–26 [Doc. No. 9]. The ALJ relied more heavily on the opinions of Dr. Sharma and the treating professionals at Boston Neurobehavioral Associates to form the basis of his assessment that Rodrigues's anxiety and depression were severe. Id. at 24–26. He found the opinions of professionals who directly examined Rodrigues and regularly treated her to be more indicative of the severity of her impairments, leading him to favor the more severe categorization of Rodrigues's impairments suggested by the record. Id.

The ALJ did not err by giving greater weight to records from the professionals who treated Rodrigues than to opinions from the state evaluators. The ALJ was not required to give dispositive weight to the state agency evaluators' opinions regarding Rodrigues's RFC. See 20 C.F.R. § 416.945(a)(3) (explaining ALJ "will assess [claimant's] residual functional capacity based on all of the relevant medical and other evidence"). Nor was the ALJ required to defer to the state agency evaluators' opinions on the ground that their opinions provide an overview of Rodrigues's entire case. See Evangelista, 826 F.2d at 144. Instead, the ALJ permissibly considered reports from Dr. Addo, Dr. Munir, P.A. McLaughlin, and other medical professionals who met with and examined Rodrigues in person over a span of months in addition to the state-evaluators' opinions. See id.

Moreover, the ALJ did not prejudice Rodrigues where he determined that her RFC was, if anything, more limited than state evaluators found. One evaluator opinion at the initial level found that Rodrigues had no medically determinable impairment. A.R. 138 [Doc. No. 9]. Another identified her psychiatric disorders as severe but ultimately found there was insufficient evidence in the medical record to address Rodrigues's allegations of disability. Id. 144–46. And the evaluator opinion at the reconsideration level found that Rodrigues had no severe impairments. Id. at 152. The ALJ stated that these evaluations were "not persuasive" and determined Rodrigues's anxiety and depression were severe impairments based on treating records. Id. at 25–26. Therefore, the ALJ did not err in discounting the state evaluator's opinions where he ultimately assigned Rodrigues an RFC that, if anything, included greater limitations than those evaluators found. See Yearling, 292 F. Supp. 3d at 520 (explaining "ALJ did not err in assigning [claimant] a more restrictive RFC than would have been justified by the opinions of the State Agency physicians" where record contained adequate support for ALJ's findings).

B.     *Whether the ALJ Erred by Failing to Address Rodrigues's Post Concussive Headache Syndrome*

Rodrigues contends that the ALJ erred by failing to address her post concussive headache syndrome and migraines. Mem. ISO Mot. to Reverse 12–14 [Doc. No. 10]. The Commissioner responds that the ALJ sufficiently addressed evidence of headaches because state evaluators considered her history of concussions and migraines, and that the ALJ only rejected their opinions to the extent that they found Rodrigues's anxiety and depression were not severe. Mem. ISO Mot. to Affirm 17 [Doc. No. 13]. Further, the ALJ did not err where "[n]o treating, examining, or consulting medical source attributed functional limitations to migraines" or headaches. Id. at 18.

"[A] finding of 'non-severe' is only to be made where 'medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered[.]'" <u>McDonald v. Sec'y of Health & Hum. Servs.</u>, 795 F.2d 1118, 1124 (1st Cir. 1986) (quoting SSR 85-28, 1985 WL 56856 (Jan. 1, 1985)). An ALJ is not required "to recite every piece of evidence" that favors the claimant so long as his decision demonstrates that he considered the record as a whole. <u>Santiago v. Sec'y of Health & Hum. Servs.</u>, 46 F.3d 1114 (Table), at *4 (1st Cir. 1995).

Here, the ALJ's decision demonstrates that he considered the record as a whole, including reports and evaluations of Rodrigues's post-concussive headache syndrome. The ALJ's opinion noted medical records that included reports of both headaches and migraines. A.R. 20 [Doc. No. 9]. Moreover, the ALJ specifically noted that Rodrigues reported headaches and migraines to a treating provider but that "neurological examinations remained unremarkable." <u>Id.</u> at 20. And the ALJ assessed the state agency medical consultants' opinions, which identified post-concussive headache syndrome. <u>Id.</u> at 25–26. The ALJ found the opinions unpersuasive to the extent that they were inconsistent with other medical records indicating Rodrigues had psychiatric disorders. <u>Id.</u> at 25–26. But the ALJ did not expressly reject the state medical evaluation by Dr. Green where it concluded that Rodrigues's post-concussive headache syndrome was not severe. <u>See id.</u> at 26; <u>see also id.</u> at 152. And the ALJ ultimately found that Rodrigues's testimony "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." <u>Id.</u> 24.

Further, Rodrigues's records from treating providers substantiate a determination that her post-concussive headache syndrome and migraines are not disabling. For example, on February 24, 2020, Dr. Boucher described her vertigo as resolved and her post-concussion syndrome as resolving. Id. 956–57. When Rodrigues visited the emergency department at St. Luke's Hospital in February 2021, her diagnosis included "migraine variant, possible tension headache," but a CT scan showed "[n]o evidence of acute intracranial haemorrhage, mass effect or midline shift." Id. 1596. Rodrigues also reported "signif[icant] improvement in headache symptoms" during the visit. Id. On March 2, 2021, at her telemedicine visit with N.P. Raymond, Rodrigues reported headaches that "feel like brain freezes" with dizziness and light sensitivity, but she also reported that her symptoms had not worsened since the CT scan in February. Id. at 719–20. Additionally, N.P. Raymond reported that Rodrigues showed no signs of acute neurologic impairment. Id. at 733. During a telemedicine visit regarding COVID-19 symptoms in October 2022, Rodrigues informed the attending P.A. that although she had been prescribed medication for migraines, she did not take it because it was "too strong and [over-the-counter] Excedrin works for her." Id. at 1708. At another emergency department visit on May 18, 2023, Rodrigues was triaged having a migraine that was "chronic w/ severe exacerbation," but her condition was generally described as "moderate," and she left the emergency department before her examination was completed and without a diagnosis. Id. at 1688, 1691–92.

In sum, the ALJ did not err by failing to discuss records of Rodrigues's post-concussive headache syndrome in more detail where the ALJ's decision demonstrates that he considered reports and evaluations of that issue, and where Rodrigues's medical records support a determination that her post-concussive headache syndrome is not a severe impairment.

C.    *Whether the ALJ Erred by Basing His Decision to Deny Benefits on Manipulated VE Testimony*

Rodrigues contends that denial of her claim was based on manipulated VE testimony due to an improper hypothetical presented by the ALJ to the VE during the hearing and that actual VE testimony supports remand for an award of benefits. Mem. ISO Mot. to Reverse 14 [Doc. No. 10]. The Commissioner responds that Rodrigues's counsel mischaracterized the exchange and that the ALJ was not required to rely on the VE's answer to counsel's modified hypothetical. Mem. ISO Mot. to Affirm 19–20 [Doc. No. 13].

"For a vocational expert's opinion to constitute substantial evidence, the testimony regarding an individual's ability to perform jobs in the national economy must come in response to a hypothetical question that accurately describes the claimant's impairments." Johnson v. Colvin, 204 F. Supp. 3d 396, 415 (D. Mass. 2016) (citing Arocho v. Sec'y of Health & Hum. Servs., 670 F.2d 374, 375 (1st Cir. 1982)). Where medical evidence does not permit an assumption in the ALJ's hypothetical, "the ALJ [cannot] rely on the vocational expert's response as a basis for finding claimant not disabled." Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994). An ALJ is not "bound to accept the factual premise of counsel's hypothetical where it was contradicted by the opinion of a medical professional." Colon v. Astrue, 841 F. Supp. 2d 495, 501 (D. Mass. 2012).

During the VE's testimony, the ALJ presented a hypothetical person who "would be able to relate to coworkers, supervisors, and the public on a superficial interactional basis." A.R. 64 [Doc. No. 9]. The ALJ further explained, "[t]hat is being defined as the exchange of work-related information or they hand you off a product or materials." Id. The VE asked to clarify whether "interaction with supervisors superficially only" included "feedback from reviews." Id. The VE further explained that because "reviews are normally about the person and not the work," she did

17

not "look at those as superficial." Id. at 64–65. The ALJ then clarified that feedback and reviews were encompassed by his hypothetical as "the exchange of work-related information . . . ." Id. at 65. Based on that hypothetical, the VE found that there were a significant number of jobs available in the national economy for that hypothetical person, including laundry worker, merchandise marker, and cleaner. Id. at 65–66.

Rodrigues's counsel then questioned the VE and asked whether any jobs would be eliminated if "interaction is completely superficial, meaning that [the ALJ's] extra clarification is not in there." Id. at 67–68. The VE replied that such a change to the hypothetical would eliminate all jobs offered in her previous response to the ALJ's hypothetical. Id. at 70.

The ALJ's hypothetical to the VE was not improper because it is supported by substantial evidence in the record. Evaluations of Rodrigues by medical examiners indicated that Rodrigues had appropriate and logical "[t]hought content and process," was generally communicative, could follow instructions, could maintain good concentration, and had intact short- and long-term memory. See e.g., A.R. 786–89, 793–846, 1102–19, 1136–83 [Doc. No. 9]. Those records also indicated Rodrigues attended an alcohol group program weekly and worked (albeit infrequently) as both a bartender and a waitress. Id. at 793, 1136. These records support the ALJ including the ability to receive feedback from a work supervisor in his hypothetical.

Rodrigues suggests that the ALJ's responses to the VE served to elicit "leading testimony" from the VE where the VE did not view superficial interactions to encompass performance reviews. Mem. ISO Mot. to Reverse 15–16 [Doc. No. 10]. But even if the VE did not agree that the actions listed in the hypothetical were all superficial, see A.R. 64–65 [Doc. No. 9], the ALJ's hypothetical was grounded in an understanding of Rodrigues's psychiatric impairments that is supported by the medical record. See Johnson, 204 F. Supp. 3d at 415

(concluding VE testimony was reliable where ALJ's hypothetical properly included plaintiff's credible impairments). Further the ALJ was not required to accept the VE's response to Rodrigues's counsel's alternative hypothetical or to include the VE's subsequent response in his final determination where counsel's statement that the hypothetical worker would be "unable to interact with supervisors on any kind of personal [basis] and unable to interact with coworkers" is inconsistent with the records on which the ALJ relied. See Colon, 841 F. Supp. 2d at 501 (explaining ALJ not bound to accept counsel's hypothetical where claimant "offered no convincing proof" of limitation that hypothetical included).

In sum, the ALJ's hypothetical is supported by substantial evidence in the medical record. Therefore, the ALJ did not err even though he defined terms in the hypothetical differently than the VE and Rodrigues's counsel.

## V.    Conclusion

For the foregoing reasons, the Commissioner's Motion to Affirm [Doc. No. 12] is GRANTED.

IT IS SO ORDERED.

September 25, 2025                         /s/Indira Talwani_____
                                          United States District Judge